72 F.3d 712
 64 USLW 2259, 95 Cal. Daily Op. Serv. 8186,
95 Daily Journal D.A.R. 14,066,
96 Daily Journal D.A.R. 447
 Denise NAVARRO; Raymond Navarro, Jr.; Claudia Navarro,
minors by and through their Guardians ad litem, Delia
Fajardo, Elvia Garcia Fajardo, Ana Garcia Fajardo, and Berta
Galvan, Plaintiffs-Appellants,
v.
Sherman BLOCK, Sheriff of Los Angeles County; Los Angeles
County, Defendants-Appellees.
 No. 94-55701.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 8, 1995.
Decided Oct. 19, 1995.
As Amended on Denial of Rehearing Jan. 12, 1996.
 
 Marco E. Lopez (argued), Bonita, California, and Jose Castorena (on briefs), Los Angeles, California, for appellants.
 Kevin C. Brazile, Deputy County Counsel, Los Angeles, California, for appellees.
 Appeal from the United States District Court for the Central District of California.
 Before: PREGERSON, POOLE, and D.W. NELSON, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 Plaintiffs-Appellants Denise Navarro and other relatives of decedent Maria Navarro (collectively "the Navarros") appeal the district court's grant of summary judgment in favor of Los Angeles County and the Sheriff of Los Angeles County. Pursuant to 42 U.S.C. Sec. 1983, the Navarros sued the County for its allegedly discriminatory policy and custom of according lower priority to 911 calls related to domestic violence than to non-domestic violence calls. We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm in part, and reverse and remand in part.
 
 FACTS AND PRIOR PROCEEDINGS
 
 2
 At 10:30 p.m. on August 27, 1989, Maria Navarro was celebrating her birthday with her relatives and friends in her home in East Los Angeles when she received a telephone call from the brother of her estranged husband, Raymond Navarro, warning her that Raymond was on his way to her house to kill her and any others present.
 
 
 3
 Maria immediately dialed 911 to request emergency assistance. She told the 911 dispatcher that she had just received a warning that her estranged husband was on his way to kill her, that she believed that he was in fact on his way to kill her, and that he was under a restraining order.[1]
 
 
 4
 When Maria stated that her estranged husband had not yet arrived, but that she believed he would definitely come to her house, the dispatcher responded, "O.K., well, the only thing to do is just call us if he comes over there ... I mean, what can we do? We can't have a unit sit there to wait and see if he comes over."Fifteen minutes after the 911 call, Raymond Navarro entered through the rear of Maria Navarro's house, shot and killed Maria Navarro and four other people, and injured two others.
 
 
 5
 On July 13, 1990, the Navarros filed the instant action in the United States District Court for the Central District of California against Los Angeles County and the Sheriff of Los Angeles County. The Navarros claimed that it was the policy and custom of the Sheriff's Department, which administers the 911 emergency system, not to classify requests for assistance relating to domestic violence as an "emergency." The Navarros argued that such a policy and custom, which discriminates against abused women, violates the Fourteenth Amendment to the United States Constitution.
 
 
 6
 The Navarros also claimed that it was the policy and custom of the Sheriff's Department not to provide adequate assistance to child victims of domestic violence and to residents of minority neighborhoods, thereby denying these respective classes equal protection of the laws. As a third cause of action, the Navarros claimed that the Sheriff's failure to train his dispatchers adequately on how to handle 911 domestic violence calls and on how to respond to 911 calls from residents of minority neighborhoods amounted to deliberate indifference to their constitutional rights.
 
 
 7
 On May 27, 1993, Defendants filed a motion for summary judgment. On January 4, 1994, the district court granted the motion, concluding that the Navarros failed to offer any evidence of a County policy or custom of treating domestic violence 911 calls differently from non-domestic violence 911 calls, nor any evidence of a County policy or custom of depriving residents in minority neighborhoods of equal police protection, nor any evidence of the Sheriff's deliberate or conscious indifference to the rights of abused women or residents in minority neighborhoods.[2] The Navarros now appeal.
 
 DISCUSSION
 
 8
 A. Standard of Review.
 
 
 9
 A grant of summary judgment is reviewed de novo. Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id.
 
 
 10
 B. Policy or Practice of Differential Treatment of Domestic
 
 
 11
 Violence Calls.
 
 
 12
 1. Existence of a Policy or Practice.
 
 
 13
 Under Monell v. Dept. of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978), municipalities may not be held liable under 42 U.S.C. Sec. 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." The Supreme Court made clear that in addition to an official policy, a municipality may be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the [governmental] body's official decisionmaking channels." Id. at 690-91, 98 S.Ct. at 2035; see also Pembaur v. City of Cincinnati, 475 U.S. 469, 481-82 n. 10, 106 S.Ct. 1292, 1299-1300 n. 10, 89 L.Ed.2d 452 (1986).
 
 
 14
 Proof of random acts or isolated events is insufficient to establish custom. Thompson v. City of Los Angeles, 885 F.2d 1439, 1444 (9th Cir.1989). But a plaintiff may prove "the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." Gillette v. Delmore, 979 F.2d 1342, 1348 (9th Cir.1992), cert. denied, --- U.S. ----, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993). Once such a showing is made, a municipality may be liable for its custom "irrespective of whether official policy-makers had actual knowledge of the practice at issue." Thompson, 885 F.2d at 1444.[3]
 
 
 15
 The Navarros claim that the County carried out a policy and practice of not treating 911 requests for assistance relating to domestic violence as "emergency" calls. The Navarros rely primarily on the deposition of Helen Pena, the 911 dispatcher who answered Maria Navarro's call. In her deposition, Helen Pena testified that it was the practice of the Sheriff's Department not to classify domestic violence 911 calls as Code 2 or "emergency procedure" calls. See Deposition of Helen Pena (5-13-93) at 32-33.[4] Ms. Pena also testified that dispatchers were not instructed to treat domestic violence calls as emergencies, that there were no clearly delineated guidelines for responding to domestic violence calls, and that as such, the dispatchers were allowed to exercise unbridled discretion. Id. at 40-42.
 
 
 16
 The County points out that Helen Pena testified that there was no written policy or procedure that precluded dispatchers from sending a patrol car to the scene of an impending domestic violence crime, nor any policy or procedure that accorded domestic violence 911 calls less priority than non-domestic violence calls. However, this testimony does not contradict Ms. Pena's admission that it was the practice of the Sheriff's Department not to classify domestic violence calls as an "emergency." Because there was no conclusive evidence that the Sheriff's Department has a policy of refusing to send a squad car to non-domestic crimes not yet in progress, or of only treating crimes in progress as emergencies, a practice of not treating domestic crimes as emergencies may have been the cause of the failure to send a squad car to assist Navarro. See City of Canton v. Harris, 489 U.S. 378, 391, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989) (stating that Sec. 1983 liability only attaches if the municipal practice "actually caused" the constitutional violation). The fact that dispatchers readily send patrol cars to crimes "in progress" regardless of their domestic or non-domestic nature also does not refute Ms. Pena's testimony regarding the general practice of the Department not to treat domestic violence calls as an "emergency." Finally, the County's defense that the discretion to send a patrol car rests with each dispatcher is not dispositive of the question whether the dispatchers in practice fail to respond to domestic violence calls unless a crime is in progress.
 
 
 17
 Fed.R.Civ.P. 56(e) provides that in opposing a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." The Navarros have satisfied this requirement. Ms. Pena's testimony that dispatchers in practice treat domestic violence calls differently from non-domestic violence calls, if proved, could establish the County's liability under Monell. We must view the Navarro's evidence in the light most favorable to them, the nonmoving party, Jesinger, 24 F.3d at 1130; thus, the district court erred in concluding that there were no genuine issues of material fact as to whether the County had a policy or custom of not classifying domestic violence calls as an "emergency."
 
 
 18
 2. Equal Protection Violation.
 
 
 19
 The County argues that even assuming that it had a policy of affording victims of domestic violence less police protection than other crime victims, there was no evidence that discrimination against women was a motivating factor behind the administration of the alleged policy.
 
 
 20
 The Equal Protection Clause of the Fourteenth Amendment states: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." Gender-based classifications must pass the "intermediate scrutiny" test, i.e., the classification "must serve important governmental objectives and must be substantially related to achievement of those objectives." Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976); see also Mississippi University for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982).
 
 
 21
 The Navarros contend that the County's custom of treating domestic violence 911 calls differently from non-domestic violence calls impermissibly discriminates against abused women. The custom of according different treatment to victims of domestic violence is gender-neutral on its face. However, it is well established that discriminatory application of a facially neutral law also offends the Constitution. See Yick Wo v. Hopkins, 118 U.S. 356, 362-63, 6 S.Ct. 1064, 1068, 30 L.Ed. 220 (1886) (invalidating ordinance which banned the operation of laundries in wooden buildings because all laundromats owned by Chinese operators were housed in wooden buildings).
 
 
 22
 Nevertheless, a long line of Supreme Court cases make clear that the Equal Protection Clause requires proof of discriminatory intent or motive. See, e.g., Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279-80, 99 S.Ct. 2282, 2296-97, 60 L.Ed.2d 870 (1979) (finding no evidence that state intended to discriminate against women by granting lifetime preference to veterans for civil service positions, even though over ninety-eight percent of veterans in state were male); Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 270-71, 97 S.Ct. 555, 566, 50 L.Ed.2d 450 (1977) (finding no evidence that city intended to discriminate against racial minorities by refusing to rezone property from single-family to multiple-family units, even though most minorities can only afford multiple-family units); Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976) ("Disproportionate impact is not irrelevant, but is not the sole touchstone of an invidious racial discrimination...."); Geduldig v. Aiello, 417 U.S. 484, 496-97 & n. 20, 94 S.Ct. 2485, 2491-92 n. 20, 41 L.Ed.2d 256 (1974) (exclusion of disability that accompanies normal pregnancy and childbirth from insurance system did not constitute invidious discrimination, absent evidence that pregnancy was a pretext to effect discrimination against women).
 
 
 23
 In Arlington Heights, the Supreme Court articulated some of the "other evidence" in addition to disproportionate impact that can establish discriminatory intent. Such evidence includes "[t]he historical background of the decision ... particularly if it reveals a series of official actions taken for invidious purposes," irregularities in the passage of legislation such as "departures from normal procedural sequence," and "legislative or administrative history" such as "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." 429 U.S. at 266-67, 97 S.Ct. at 563-64.[5]
 
 
 24
 In Balistreri v. Pacifica Police Department, 901 F.2d 696 (9th Cir.1990), we found that the plaintiff, a victim of domestic violence who sued the police for failing to protect her, alleged sufficient facts to suggest animus against her because she is a woman. We pointed out, for example, that the officer who responded to one of her complaints stated that he did not blame her husband for hitting her because of the way she was "carrying on." Id. at 701. In the present case, however, aside from the conclusory allegation that the County's custom of not classifying domestic violence calls as an emergency discriminates against abused women, the Navarros have failed to offer any evidence of such invidious intent or motive. See Hynson v. City of Chester, Legal Dep't, 864 F.2d 1026, 1031 (3d Cir.1988) (finding domestic violence and non-domestic violence categories used by police in administering law insufficient to raise claim for gender-based discrimination absent showing of intent to discriminate against women); Watson v. City of Kansas City, 857 F.2d 690, 697 (10th Cir.1988) (same).
 
 
 25
 Nevertheless, even absent evidence of gender discrimination, the Navarros' equal protection claim still survives because they could prove that the domestic violence/non-domestic violence classification fails even the rationality test. Unless a statute employs a classification that is inherently invidious (such as race or gender), or that impinges on fundamental rights, we exercise only limited review. Schweiker v. Wilson, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981). At a minimum, however, the Supreme Court "consistently has required that legislation classify the persons it affects in a manner rationally related to legitimate governmental objectives." Id. Although we may not substitute our personal notions of good public policy for those of the legislature, the rational-basis standard is "not a toothless one." Id. at 234, 101 S.Ct. at 1082 (quoting Matthews v. Lucas, 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976)).
 
 
 26
 C. Deliberate Indifference Arising From Failure to Train
 
 
 27
 Dispatchers on Domestic Violence.
 
 
 28
 The Navarros also contend that the Sheriff's failure to train dispatchers on how to handle 911 domestic violence calls, and to instruct dispatchers to treat such calls in the same manner as they treat non-domestic violence calls, amounts to deliberate indifference to the equal protection rights of abused women. However, the Navarros fail to offer any evidence to support these claims. Nor have the Navarros offered any evidence to refute Ms. Pena's testimony that she received an eight-hour course on how to handle domestic violence cases. Pena Deposition at 41. Accordingly, we affirm the district court's conclusion that the Navarros' deliberate indifference claim fails to survive summary judgment.
 
 CONCLUSION
 
 29
 For the foregoing reasons, we (1) affirm the district court's conclusion that the Navarros have failed to provide sufficient evidence to defeat summary judgment on their claim of deliberate indifference to constitutional rights arising from a failure to train 911 dispatchers; and (2) reverse the district court's grant of summary judgment on the Navarros' equal protection claim because genuine issues of material fact remain as to whether the County had a custom of not classifying domestic violence 911 calls as "emergencies." AFFIRMED in part, and REVERSED and REMANDED in part for further proceedings consistent with this opinion.
 
 
 
 [1]
 Maria Navarro obtained the restraining order in January 1989. The restraining order expired that same month. However, the fact of the expiration was not known to the 911 dispatcher
 
 
 [2]
 The issues of the County's alleged discriminatory policy or custom of affording less police protection to child victims of domestic violence and to residents of minority neighborhoods and the Sheriff's alleged indifference to the rights of these respective classes are not being appealed
 
 
 [3]
 The court in Thompson explained that the existence of custom as a basis for Sec. 1983 liability ensures that municipalities are held responsible for widespread abuses or practices that cannot be affirmatively attributed to the decisions or ratification of an official policy-maker "but are so pervasive as to have the force of law." 885 F.2d at 1444
 
 
 [4]
 Ms. Pena answered as follows:
 Q: So there's certain calls that would fall under the category of emergency procedure calls?
 A: Yes.
 Q: Would domestic violence calls come within that category?
 A: As emergency procedures?
 Q: Yes.
 Q: ... Let's say, spouse beating up on wife, would it fall under that procedure?
 A: Are we speaking of today or are we speaking of ...
 Q: 1989.
 A: 1989? No.
 
 
 [5]
 In Feeney, the Supreme Court noted that it was not enough to prove that a policy maker could foresee the discriminatory consequences of his decision: " 'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." 442 U.S. at 279, 99 S.Ct. at 2296 (internal citation omitted). Thus, the foreseeability of a disproportionate impact on abused women, alone, cannot invalidate the County's domestic violence/non-domestic violence classification