Garry L. DIAMOND

v.

James B. KENLEY, M. D., et al.

Civ. A. No. 80–0005–R.

United States District Court,
E. D. Virginia,
Richmond Division.

June 1, 1981.

Malcolm Pitt Friddell, Richmond, Va., for plaintiff.

Paul A. Sinclair, Asst. Atty. Gen., Richmond, Va., for defendants.

## MEMORANDUM

WARRINER, District Judge.

At the trial of this action held on 6 April 1981, the Court requested the parties to file post-trial briefs on the issues which the Court considered to be seriously in dispute. The post-trial briefing has now been completed and this case is ripe for review.

The facts of this case may be briefly stated. On 31 January 1977 the Circuit Court of Prince William County convicted the plaintiff of abduction, rape, and sodomy. The plaintiff was thereupon sentenced to 25 years imprisonment, 10 years of which were suspended, and he was placed in the custody of the Virginia Department of Corrections.

On or about 5 January 1979, the plaintiff enrolled with 18 other inmates at the Virginia State Penitentiary in a rehabilitative training program entitled "Care and Transportation of the Sick and Injured." Testimony offered at trial showed that this rehabilitative training program was designed to prepare the participants to take any tests required for certification in and to obtain employment as Emergency Medical Technicians (EMT's). Dr. Loren G. Martin, who developed and supervised the training program, states in his de bene esse deposition that prior to offering the course to the inmates he personally contacted a representative of the Virginia State Department of Emergency Medical Services to discuss the requirements for certification as an EMT in the State of Virginia. Dr. Martin was informed at that time that as a requirement for certification the program would have to enlist the participation of State approved instructors. Qualified instructors from three Richmond area rescue squads thereafter participated in training the inmates.

After completing the training program, the plaintiff and the 18 other inmates applied to the National Registry of Emergency Medical Technicians for testing and national certification as EMT's. The National Registry approved all 19 applications from the inmates, and each inmate took and passed the required test for certification as an EMT. On 6 June 1979 the National Registry conferred on the plaintiff and the other 18 inmates provisional registration as nationally certified EMT's.

Only at the end of the training course did Dr. Martin become aware that certain rules adopted by the Board of Health of the Commonwealth of Virginia prohibited State certification as an EMT of any person who had at any time been "convicted of a felony involving any sexual crime." Section 5.01.-01(f) of the Board's Rule and Regulations Governing Emergency Medical Services establishes as a general requirement for certification as an EMT that the person never have been convicted of a felony involving any sexual crime. Section A.6.(e) of the Procedures and Guidelines for Instructors in Emergency Medical Technician Programs further provides that persons convicted of a felony involving any sexual crime are not eligible to attend the basic EMT training course. Section 6.02.02 of the Rules and Regulations incorporates by reference the

restriction on eligibility for training programs set forth in § A.6(e). The Board's regulations, however, permit persons in disqualified categories to apply for an exemption in accordance with the procedure set forth in § 7.03 of the Rules and Regulations Governing Emergency Medical Services.

On 5 September 1979, the plaintiff and the 18 other inmates applied to the Virginia Department of Health seeking conferral of Equivalent Reciprocal Training Certificates which would permit them to be certified as EMT's in the Commonwealth of Virginia. The plaintiff enclosed with his application a request for exemption from § 6.02.02 of the Rules and Regulations and § A.6(e).

On the basis of § A.6.(e), the defendant members of the State Board of Health voted to deny the plaintiff's requested exemption and also the requested exemption of seven other similarly situated inmates. This occurred on 22 October 1979. Eleven inmates who had not been convicted of a felony involving a sexual crime or a drug-related offense received their Equivalent Reciprocal Training Certificates, however.

The plaintiff now contends, on a number of grounds, that the denial of the training certification, which had the ultimate effect of denying certification as an EMT, violated his constitutional rights. The plaintiff suggests, first, that the challenged regulations are unconstitutionally over-inclusive in that they fail to differentiate between "rehabilitated" and "unrehabilitated" sex offenders. He includes himself within the class of rehabilitated sex offenders, and he argues that—assuming there is a valid reason for disqualifying certain sex offenders—there is no reason to disqualify him since he no longer poses a risk to society.

There was no evidence presented at trial from which the Court can conclude that the plaintiff is "rehabilitated." The plaintiff sought to obtain evidence to this effect from the counselor who supervised the plaintiff at the State Penitentiary. The counselor was sincerely convinced that his own efforts and those of the plaintiff had worked a transformation, so that the plaintiff could be declared to be rehabilitated. The Court could not permit the introduction of the counselor's conclusion, however, because the counselor had not been qualified to testify as an expert regarding the plaintiff's rehabilitation.

█ Indeed, there was no showing at trial that any sure predictive means exists for determining that a prisoner has been rehabilitated. The Court doubts that such a means does exist. A propensity to crime cannot be explained solely as detectable and correctable "errors of thinking," as the counselor proposed at trial. Man is not a machine which, when it malfunctions, can be tinkered with, repaired, and confidently put back into operation. While the Court hopes that the plaintiff has rehabilitated himself, that cannot be accepted as a proven—or provable—fact.[1] The plaintiff's claim that the regulations are overinclusive will accordingly be dismissed.

The plaintiff next contends that the challenged regulations violate his rights under the Fourteenth Amendment Due Process Clause in that they impose a requirement for training and certification which has no rational connection with one's fitness or capacity to be an Emergency Medical Technician. In the presentation of evidence and in his argument to the Court at trial, the plaintiff stressed the deposition testimony of Richard K. Seely, Director of the Intensive Treatment Program for Sexual Aggressives at the Minnesota Security Hospital, and that of Dr. Seymour L. Halleck, Professor of Psychiatry at the University of North Carolina. Both Dr. Halleck and Mr. Seely stated that individuals who have previously been convicted of rape will not likely be stimulated to rape if required to perform the tasks of mouth-to-mouth resuscitation or cardiopulmonary resuscitation. Dr. Halleck stated that "in the majority of instances" a healthy and conscious female would be a more desirable target for a rapist than an incapacitated, unconscious,

---

1. Of course, in a given case it may be proven that one has *refrained* from crime and this may be evidence of rehabilitation. But such proof does not involve expert opinion.

sick, or injured female. Mr. Seely concurred in this view, stating that "it would be extremely rare that a person would view an incapacitated, unconscious, sick or injured female as a potential victim of sexual assault." When asked whether he felt any aspect of the job as an EMT might render that job unsuitable for a former sex offender, Dr. Halleck responded:

> If the former sex offender still has impulses to rape, any job which puts him in contact with other people may increase the likelihood of his committing a sex offense. I do not believe the medical technician role would be any more risky than other jobs such as salesperson which would put the ex sex offender in contact with possible victims.

The defendants did not introduce evidence to contradict the conclusions of Dr. Halleck and Mr. Seely recited above.

While it will accept all of Dr. Halleck's and Mr. Seely's conclusions as reliable and valid, as it must under the state of the facts, the Court finds that those conclusions do not demonstrate that the Commonwealth of Virginia has no good reason to disqualify sex offenders from serving as EMT's. Dr. Halleck's and Mr. Seely's conclusions are couched in cautionary phrases, such as "it is likely that . . . ," "in the majority of instances," and "it would be extremely rare for. . . ." The Virginia Board of Health, however, cannot enact one set of regulations for "the majority of instances" and another for the "extremely rare" circumstance. In 1969, the Board was called upon to determine whether as a general rule sex offenders ought to be certified to perform the services of an EMT. The Board decided to prohibit certification of sex offenders, and the Court finds, on the basis of plaintiff's experts' testimony, that this decision is not without a rational basis.

As indicated above, at trial the plaintiff offered no ready means to distinguish between the sex offender who will rape again and the sex offender who will not. Dr. Halleck, in his deposition on the plaintiff's

behalf, acknowledged that the sex offender who maintains his impulse to rape may pose a risk if his job brings him into contact with other people. Dr. Halleck obviously reasoned, however, that all, or nearly all, jobs involve contact with other people, so Dr. Halleck concluded that a sex offender's employment or voluntary service as an EMT would be "no more risky" than his employment as a salesman. This may be true, but it does not establish that when the State denies certification as an EMT it acts arbitrarily. On the contrary, the State is in no different position than the shop owner who decides that, all things considered, he would prefer not to employ convicted sex offenders in sales positions because it might be "risky" to put the ex-sex offender in contact with possible victims and because the shopowner might jeopardize the goodwill of the community.

■ The State EMT certificate represents an official seal of approval, for it signifies that the EMT is entitled to the public's trust. Susan D. McHenry, Director of the Bureau of Emergency Medical Services in the State Department of Health, repeatedly stressed at trial that maintenance of public trust is essential to the effective delivery of health care services. According to Ms. McHenry, the patient must cooperate fully with the EMT, or the treatment may prove less successful or totally unavailing. Ms. McHenry testified further that EMT's regularly have what was described as intimate contact with the persons placed in their care, and she stated that in some of these circumstances the EMT is alone with the patient. This testimony lays the groundwork for the reasonable conclusion that certification of sex offenders as EMT's may undermine public trust in emergency health care services. And the result of decreased public confidence is not at all speculative. When there is a need for emergency services, a minute's hesitation in calling for assistance can have disastrous consequences.[2]

2. In her testimony, Ms. McHenry focused primarily upon the impact certification of sex of-

fenders would have on rescue squads and ambulance services. The plaintiff indicated at

At trial, plaintiff's counsel questioned Ms. McHenry as to the history of the regulation barring sex offenders from certification. Ms. McHenry stated that the regulation in issue was first adopted by the Board of Health in 1969. The emergency medical services regulations then underwent a total review in March, 1979. According to Ms. McHenry, in the course of the 1979 revisions, the sex offender disqualification provision was thoroughly discussed by both the Manpower and Training Task Force and the State Emergency Medical Services Advisory Council. Both groups firmly recommended to the State Board of Health that the provision should remain in the regulation. In response to the Court's question, Ms. McHenry explained the nature of the concerns expressed by the Task Force and the Advisory Council:

> The discussions [regarding the challenged regulations] mainly focused on the possibility, or the opportunities that might present themselves in providing emergency medical care for this type of person [the sex offender] to be under a great deal of stress and to be in a situation where they would have a victim already there with them. . . . And the other emphasis that they had in their discussion was in terms of the public confidence, the necessary public confidence and trust in our emergency medical care system, if it's to work properly.

The Court does not consider it at all irrational to give great weight to these concerns in fashioning eligibility rules.

Additional evidence was presented by the defendants showing that the morale of rescue squads would be adversely affected were members of those squads required to work alongside convicted sex offenders. A decline in morale could itself cause a decline in the quality of services provided, according to the testimony of John C. Phillips, president of the Virginia Association of Volunteer Rescue Squads. Specifically, Mr. Phillips testified that members of his association were concerned about a likely decline of services caused by the fact that members of the rescue squad would have to divide their attention to care for the patient and to monitor the activities of the sex offender. Mr. Phillips stated that he personally shares this concern.

On the state of the record, the Court finds ample evidence from which to conclude that there is a rational basis for the challenged regulations.[3] The Commonwealth of Virginia has a legitimate interest in maintaining the effectiveness of delivery of emergency health care services and in assuring the quality of those services.

The Court will now proceed to consider the most fertile ground for dispute in this case. As his third and final claim, the plaintiff argues that, even accepting the fact that there is a rational basis for disqualifying sex offenders from certification, the regulations must be struck down for they are unconstitutionally underinclusive. He points to the fact that the regulations in force at the time he was denied certification

several points in the trial that State law requires that an EMT be employed in every active coal mine. He suggested that sex offenders could serve as EMT's in coal mines without jeopardizing the safety of the general community, and on this basis he sought to characterize the regulation as over-restrictive.

Ms. McHenry testified that the number of EMT's employed other than as ambulance or rescue squad attendants was not significant. Again, it is not unreasonable for the State to adopt a rule of general application rather than separate rules to fit exceptional circumstances. The plaintiff's challenge on this ground is rejected.

**3.** At trial, the fact developed that neither Ms. McHenry, Director of the Bureau of Emergency

Medical Services, nor Dr. James B. Kenley, Commissioner of Health for the Commonwealth of Virginia—both individuals charged with administering the regulations promulgated by the Board of Health—could adequately define the term "sexual crime" as used in the challenged regulations. Because the designated administrators were unclear as to the scope of the regulations, the plaintiff argues that any application of the regulations is arbitrary.

There is no evidence that the regulations have been applied beyond the reasonable bounds of the phrase "sexual crimes," however. The plaintiff, who was convicted of rape, clearly falls within the category of persons the regulation was intended to reach.

prohibited only the certification of sex offenders. Other offenders, including murderers, were eligible for certification.[4]

The plaintiff argues that the challenged regulations are invalid because the defendants in this case have failed to identify relevant characteristics which distinguish individuals convicted of sexual crimes from individuals convicted of other violent or reprehensible crimes, in order to justify singling out sex offenders for denial of certification as EMT's. This argument gave the Court pause at trial, and the Court ordered post-trial briefing primarily so that it could have a better understanding of the case law in this area before making its decision.

The Court has now reviewed the case authority cited by both the plaintiff and the defendants. On the basis of that review, judgment will be entered in favor of the defendants on this issue.

In his argument to the Court, the plaintiff stresses the Fourth Circuit's unpublished opinion in *Woods v. Landon*, 599 F.2d 1050 (4th Cir. 1979). In *Woods*, the Fourth Circuit considered a challenge to a prison regulation which made sexual offenders ineligible for "A" minimum custody status and the attending opportunities for participation in programs such as work/study release and furloughs. The prisoner challenged the regulation on equal protection grounds, and he asserted that had he been convicted of a murder charge he would have been able to achieve "A" custody status. The Fourth Circuit panel vacated the judgment of the district court dismissing the action, and the case was remanded for the district court to require that the prison authorities show a rational basis for distinguishing violent sexual offenders from inmates who have committed other kinds of violent crimes in order to justify the distinction made in the regulation.

Contrary to the assertion of plaintiff's counsel, *Woods* is not dispositive of this case. The context of the *Woods* case and the present case are entirely different. In *Woods*, the Fourth Circuit was called upon to review a regulation which made distinctions, within the prison setting, between sex offenders and other types of violent offenders. The rule at issue, by its very nature, could only apply to prisoners; the affected class, therefore, was the general prison population. The Fourth Circuit instructed the district court to determine whether the distinction made within the affected class had a rational basis.

During closing argument at trial, the Court discussed with counsel for the plaintiff whether the plaintiff was entitled to compare himself with murderers or rather whether he should be required to compare himself with the general population, to show that the disabling regulation lacked a rational basis. At that time the Court was of the impression that a comparison with the general population had to be made because the regulation declares who among the general population is eligible to serve as an EMT. The Court remains of that impression.

In the present case, therefore, the affected class will be taken to be the general population. Within that class, a distinction is made. Otherwise qualified sex offenders are denied certification as EMT's, while the remainder of the qualified members of the general population may be granted certification. The Court has previously found that there is a rational basis for this distinction. This would end the inquiry mandated in *Woods*.

The plaintiff argues, however, that a two-part distinction ought to be made. He maintains first that sexual offenders and other types of violent offenders ought to be compared with each other. He suggests that, to the extent qualification as an EMT is at issue, there is no difference between sexual offenders and other types of violent

---

4. Effective 1 April 1980, the Rules and Regulations Governing Emergency Medical Services were amended as they apply to convicted felons. Section 5.01.01(f), which disqualifies sex offenders, was maintained in the amended Rules and Regulations. Section 5.01.01(g) was added, and it provides that all other felons are ineligible for certification for a period of five years after their final release.

offenders. Therefore, when the second comparison—that between sex offenders and the general population—is made, the plaintiff argues that sex offenders can be disqualified from service as EMT's only if all other violent offenders are similarly disqualified. If a disabling regulation fails to perfectly categorize those who are like the plaintiff and to treat them equally then, according to the plaintiff, the regulation must be struck down.

In addressing the logic of the plaintiff's argument, the Court must first note that the plaintiff provides insufficient factual support for his suggestion that sex offenders are no different from other types of violent offenders. During the course of his argument of the case, counsel for the plaintiff used the specific comparison of sex offenders to murderers, and he maintained that no reasonable distinction could be drawn. But Dr. Halleck in his deposition on the plaintiff's behalf stated that, based on his experience, murderers are least likely to repeat their offense. This in itself can serve as a reasonable basis for distinguishing between sex offenders and murderers.

Another reasonable distinction was provided on cross-examination by John Phillips. Mr. Phillips testified that, at a statewide meeting of the Virginia Association of Volunteer Rescue Squads, the question was discussed whether any type of felon should be certified as an EMT. It was agreed at the meeting that sex offenders and those convicted of drug offenses should not be certified. According to Mr. Phillips, the persons present at the meeting indicated that they also felt that murderers should be disqualified. Following the meeting, Mr. Phillips pursued with other persons the question of a murderer's qualifications. In this conversation, according to Mr. Phillips, the opinions expressed were to the effect that murderers' eligibility for EMT's ought to be judged on a case-by-case basis. The difference perceived by this small group was, to paraphrase Mr. Phillips, that murder can be a crime of passion or result from an instantaneous jealousy, and if it is of this type, it is unlikely to be repeated. A sex crime, on the other hand, is an act of violence for which the cause is less understandable, and therefore the risk of repeated sex offenses is more feared.

The Court, of course, does not rely specifically on Mr. Phillips' discussions since it was not shown that the State Board of Health had the benefit of the testimony offered in court. Nor does it entirely agree with the opinions expressed. But the opinions demonstrate that when murderers and sex offenders are considered side by side, a distinction can be made as to their respective suitability for service as an EMT. The Court does not find the distinction to be unreasonable.

One other basis for distinguishing between sex offenders and other types of violent offenders occurs to the Court but was not mentioned at trial. An EMT prone to committing a sex offense who is alone with an unconscious patient can sexually abuse that patient and his offense may very easily go undetected. This is less likely true of the murderer or of other violent offenders. It may therefore be reasonably determined that since the deterrent effect of the risk of discovery may be lacking, sex offenders should be barred from service as EMT's altogether.

The Court does not accept the plaintiff's suggestion that murderers or other violent offenders are indistinguishable from sex offenders, to the extent that their qualification to serve as an EMT is concerned. Rather, the Court finds that there was a reasonable basis for the State Board of Health to act as a matter of first priority upon the question whether to disqualify sex offenders from service as EMT's.

The Court further rejects the plaintiff's proposed remedy of judicial invalidation of any regulation which fails to perfectly categorize the plaintiff's group along with all other groups like his. As the Supreme Court has recently recognized in the context of a Fifth Amendment inquiry, and as equally applicable to this Court's Fourteenth Amendment inquiry:

The equal protection obligation ... is not an obligation to provide the best gover-

nance possible. This is a necessary result of different institutional competences, and its reasons are obvious. Unless a statute employs a classification that is inherently invidious or that impinges on fundamental rights, areas in which the judiciary then has a duty to intervene in the democratic process, this Court properly exercises only a limited review power over Congress.

*Schweiker v. Wilson,* —— U.S. ——, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186, 195 (1981).

■ In this case, the plaintiff does not argue that the challenged regulations affect a fundamental right or "suspect" classification. The Court need only determine, under the rational basis standard, whether the regulatory scheme of the State Board of Health advances legitimate goals in a rational fashion. *Id.* at —— —— ——, 101 S.Ct. at 1082–1083, 67 L.Ed.2d at 197–198. As the Supreme Court has instructed:

> This inquiry employs a relatively relaxed standard reflecting the Court's awareness that the drawing of lines is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary.

*Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976).

This Court has previously cited with approval the following summary of rational basis review made by Circuit Judge Tamm, writing for a three-judge district court in *National Organization for the Reform of Marijuana Laws v. Bell,* 488 F.Supp. 123, 134–135 (D.C.1980):

> Legislation that does not affect a "fundamental" right or a "suspect" class need only bear a rational relationship to a legitimate state interest.
>
> The distinctions drawn by a challenge to the statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if these reasons are totally unrelated to the pursuit of that goal. Legislators are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classification will be set aside only if no grounds can be conceived to justify them.

*McDonald v. Board of Election Commissioners,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). This standard of judicial review gives legislators wide discretion and permits them to attack problems in any rational manner. *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). "In an equal protection case of this type . . ., those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 950, 59 L.Ed.2d 171 (1979). The classification will be upheld unless the "varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational." *Id.* at 97, 99 S.Ct. at 943. "In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed on suspect lines. . . ." *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).

See *Wolkind v. Selph,* 495 F.Supp. 507, 509–510 (E.D.Va.1980).

The Court does not intend to sit as a "superlegislature" in this or any case. In comparing the variety of offenders with the general population, the State Board of Health determined first to promulgate a rule disqualifying only sex offenders. Upon further consideration, and after the passage of 11 years, the Board adopted a second provision barring all felons (other than sex offenders) from certification for a period of five years commencing with their final release date.

The State Board of Health thus chose to address the problem of felons' suitability for certification in several stages, and it has promulgated different rules for sex offenders than for all other offenders. These facts do not state a constitutional violation. As has long been recognized by the Supreme Court:

> The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy, neglecting the others. The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. [Citations omitted throughout.]

*Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955).

█ In this case, the Court finds nothing in the regulatory processes at issue which can be termed "inherently invidious" or "invidiously discriminatory." There is thus no cause for the Court to intervene in an area where the regulators have far more information and expertise than does the Court.

In his post-trial briefing, the plaintiff refers the Court to a number of decisions in addition to *Woods v. Landon* which he claims support a finding in his favor. The Court will review these cases in turn, but nothing in the cases alters the Court's opinion that the plaintiff has failed to show a violation of his equal protection rights.

In *Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966), the Supreme Court considered a complaint brought by a New Jersey State prisoner. A New Jersey statute in effect at the time the complaint arose required prisoners confined in State institutions to reimburse the State for the cost of the trial court transcript in the event of an unsuccessful appeal of a conviction. The New Jersey law did not,

however, impose the financial burden of reimbursement upon all who had been convicted and who had appealed unsuccessfully. For example, it did not require repayment from anyone who had received a suspended sentence or had been placed on probation. Id. at 308, 86 S.Ct. at 1499.

In *Rinaldi*, the class affected by the regulation was the group of persons who had been tried and convicted and who had unsuccessfully appealed. Among this group, a distinction was made. Persons confined in State institutions had to reimburse the State for the cost of the transcript on appeal; all other persons in the class did not have to reimburse the State. The *Rinaldi* Court noted that "the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.' [Citations omitted.]" Id. at 309, 86 S.Ct. at 1499–1500. With respect to the challenged statute, the Court found no basis upon which to distinguish non-institutionalized convicts from their institutionalized counterparts. Id. at 309–310, 86 S.Ct. at 1499–1500. As the plaintiff himself notes at page four of his post-trial brief, the Court in *Rinaldi* was not called upon to distinguish the institutionalized convicts' status from that of the general population.

The plaintiff also discusses the decision in *James v. Strange*, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972). In that case, the plaintiff challenged a Kansas recoupment statute through which the State could recover counsel and legal defense fees expended for the benefit of indigent defendants. Under the statute, upon the indigent defendant's failure to reimburse the State within 60 days of his notice, the debt became a lien on the real estate of the defendant and could be collected by garnishment. The particular statute in question, however, "strip[ped] from indigent defendants the array of protective exemptions Kansas has erected for other civil judgment debtors. . . ." Id. at 135, 92 S.Ct. at 2031. Justice Powell, writing for the Court, noted that one who had hired counsel in his own

defense, should he later be unable to pay, would be protected by the exemptions denied the indigent defendant. Id. at 136–137, 92 S.Ct. at 2032.

In *James*, the class affected by the statutory scheme was the group of judgment debtors who owed attorney's fees. Among this group, a distinction was made. Defendants with retained counsel were afforded the protective exemptions generally available to judgment debtors in the State of Kansas. Indigent defendants for whom counsel had been appointed were denied these exemptions. The Court in *James* held that the distinction drawn within the affected group lacked a rational basis. Id. at 140–142, 92 S.Ct. at 2034–2035. Justice Powell noted that while recoupment statutes serve a legitimate State interest, the Kansas statute discriminatorily denied rights to indigent defendants which were available to all other judgment debtors. Id.

Both *Rinaldi* and *James* were decided on the ground that there was no rational basis for the distinction made within the affected class. In this case, the affected class is the general population. A distinction is made within the affected class, and the Court has found that the distinction has a rational basis. Thus, the present case is distinguishable from the Supreme Court authority to which the Court is referred by the plaintiff.

The Court will next consider the decision in *Miller v. Carter*, 547 F.2d 1314 (7th Cir. 1977), aff'd by an equally divided court, 434 U.S. 356, 98 S.Ct. 786, 54 L.Ed.2d 603 (1978). In that case, an individual convicted of armed robbery applied for a public chauffeur's license to qualify for employment as a taxi cab driver. The city denied his application on the basis of an ordinance which declared that such a license may not "be issued to any person at any time after conviction of a crime involving the use of a deadly weapon, traffic and narcotic drugs, the infamous crime against nature, incest, or rape." Id. at 1315. The district court in *Miller* sustained the challenged ordinance in the face of due process and equal protection clause challenges. This judgment was reversed on appeal because the majority, writing per curiam, found that the regulation violated the equal protection clause in that it absolutely barred from obtaining a license any person who had been convicted of one of the specified offenses prior to his application for a license, but it permitted anyone who had already obtained a license to retain it even though he had subsequently been convicted of one of the offenses specified in the regulation. The majority therefore found that the challenged regulation irrationally discriminated among the class of ex-offenders. The majority opinion in *Miller* has no direct application to the present case, for the plaintiff here does not contend that persons convicted of rape after their certification as an EMT would not lose their license to serve in that capacity.

While the concurring opinion in *Miller* written by Judge Campbell is, of course, not controlling, the plaintiff stresses the fact that in his concurrence Judge Campbell saw fit to consider an equal protection argument which was not addressed in the majority opinion. The plaintiff in *Miller* had raised an equal protection challenge based on the fact that persons previously convicted of a crime involving use of a deadly weapon were absolutely barred from obtaining a license, but persons convicted of other types of offenses were not. In addressing this issue, Judge Campbell noted, as the plaintiff acknowledges, that the City of Chicago had a valid purpose in adopting the regulation: "The City of Chicago has a legitimate interest in promoting public safety, and in this connection, may regulate the issuance of public chauffeur's licenses so as to better insure that the character and competence of the licensee is consistent with the high standards traditionally imposed upon common carriers with respect to the care and safety of public passengers." Id. at 1322. This statement in fact supports this Court's earlier finding that the regulation at issue in this case has a rational basis because the Commonwealth of Virginia has a legitimate interest in promoting public safety and public confidence in emergency health care services.

In his analysis of the concurring opinion in *Miller*, the plaintiff also emphasizes the fact that Judge Campbell made the following evaluation of the rational basis of the challenged regulation:

Defendant's principal concern in considering the past criminal record of an application is the prospect of a driver placing a passenger in physical jeopardy. Accordingly, the ordinance gives greater weight to crimes such as armed robbery and rape than to crimes not involving violence and crimes not directed against other persons. If anything, this added specificity supports the constitutionality of this statute by more narrowly defining the class of persons to whom public chauffeur's licenses may not issue.

Id. at 1322. The plaintiff's point is that the ordinance at issue in *Miller* was constitutional because it was "all-inclusive;" that is, all types of offenders who might in the future pose risks to taxi cab passengers were disqualified from obtaining chauffeur's licenses. This is an over-extension of Judge Campbell's point, however, because Judge Campbell made no such finding that *all* offenders who could pose a threat were prohibited from obtaining a license. It cannot be concluded from Judge Campbell's opinion that, had the City of Chicago barred only sex offenders from receiving a chauffeur's license, the ordinance would have been struck down on equal protection grounds.

The plaintiff next discusses the decision in *Wessling v. Bennett*, 290 F.Supp. 511 (N.D.Iowa), aff'd, 410 F.2d 205 (8th Cir. 1969). There the petitioner asserted that the Iowa Recidivist's Statute under which he was sentenced violated the equal protection clause because the enhanced penalty provided by that statute applied only to "larceny connected" crimes. In denying the petitioner's claim, the district court stated:

A recidivist statute is not constitutionally deficient for the mere reason that it does not include all felonies. [Citation omitted.] The enumerated offenses are of a like nature and the legislature could reasonably believe that persons committing such crimes have a greater criminal pro-

pensity or disposition than persons committing other crimes.

290 F.Supp. at 516. This point was not specifically reviewed in the appellate decision.

The plaintiff again highlights the fact that the court in *Wessling* determined that the offenses outlined by the statute were "of a like nature." All that the *Wessling* court did, however, was to compare among the "larceny connected" crimes. The Court then deferred to the legislative judgment and found that it could reasonably be believed that persons committing larceny offenses have a greater criminal propensity or disposition. This was the end of the Court's inquiry. The Court recognized that "a recidivist statute is not constitutionally deficient for the mere reason that it does not include all felonies." Id. In like manner, the EMT certification regulations ought not be constitutionally infirm simply because they fail to disqualify all felons.

The plaintiff also brings to the Court's attention the decision in *Muhammad Ali v. Division of State Athletic Commission*, New York, 316 F.Supp. 1246 (S.D.N.Y.1970). That case arose when, in 1969, the New York State Athletic Commission denied Ali's application for a renewal of his license to box due to his refusal to submit to induction in the Armed Forces and his subsequent felony conviction for that federal offense. The court in *Ali* found that denial of Ali's application constituted a violation of the Equal Protection Clause.

The facts in *Ali* are sufficient to distinguish that case from the present action. In *Ali*, it was shown that there existed

at least 244 instances in recent years where [the Athletic Commission] has granted, renewed or reinstated boxing licenses to applicants who have been convicted of one or more felonies, misdemeanors or military offenses involving moral turpitude. Some 94 felons thus licensed included persons convicted for such anti-social activities as second degree murder, burglary, armed robbery, extortion, grand larceny, rape, sodomy,

aggravated assault and battery, embezzlement, arson and receiving stolen property.

Id. at 1249. Under these circumstances, it could arguably be concluded that the denial of Ali's application for renewal of his license represented an "intentional, arbitrary and unreasonable discrimination against [Ali]. . . ." Id. at 1250.[5]

In this case, however, the plaintiff has not shown that the State Board of Health had by its past practices indicated that it did not consider criminal convictions, particularly for sex offenses, to be a significant factor in eligibility for service as an EMT. In fact, Susan McHenry testified that prior to the application by the inmates who completed the training program, no felons had sought to be licensed. The Board of Health responded to the applications by invoking the rules as they existed at the time, granting reciprocal training certification to 11 inmates who had not previously been convicted of sex or drug offenses but denying certification to the plaintiff and 7 other inmates. Following the certification of the 11 inmates, the rules were reviewed and revised to restrict to some degree all felons' eligibility for certification. It is clear from a summary of the process involved that the plaintiff was not singled out arbitrarily or for a discriminatory purpose. For this reason, this action is distinguishable from *Ali*.

This case may also be distinguished from *Thompson v. Gallagher*, 489 F.2d 443 (5th Cir. 1973). In *Thompson*, the plaintiff challenged a city ordinance which prohibited veterans with other than an honorable discharge from being employed by the city of Plaquemine, Louisiana. The ordinance was invalidated because the Fifth Circuit Court found that in two respects the ordinance lacked a rational basis. First, the grounds for a dishonorable discharge did not necessarily bear on a person's suitability for employment by the city. Id. at 449. Second, under the ordinance, only veterans were subject to review for character fitness; the city imposed no corresponding fitness requirements on nonveterans. Id.

In this case, the Court has held that a past conviction for a sex offense does have a reasonable bearing on a person's suitability for service as an EMT. Unlike *Thompson*, the categories created by the regulations at issue here are comprehensive; for example, no distinction is made as to whether the sex offense was committed in or out of military service. Furthermore, the Court has determined that a rational basis exists for distinguishing sex offenders from both the general population and other types of offenders. The plaintiff's reliance on *Thompson* is therefore misplaced.

In conclusion, the plaintiff, despite enterprise, research, ingenuity and lawyerlike advocacy by counsel, has failed to establish that the distinctions drawn by the challenged regulations are arbitrary, irrational, or result from discriminatory intent. This Court will not, therefore, substitute its judgment for that of the agency and individuals charged with regulating the certification of Emergency Medical Technicians.

On all grounds, judgment will be granted in favor of the defendants.

An appropriate order shall issue.

---

**5.** Though such an argument could be made this Court believes that the proper argument to be made is simply that the trial court was wrong in *Ali*.