En el Tribunal Supremo de Puerto Rico

| RUPERTO LOPEZ HERNANDEZ Y OTROS<br>      Demandante-Peticionaria<br><br>     .V<br><br>CENTRO DE MAYAGUEZ DPTO. DE SALUD<br><br>      Demandado-Recurrido | Certiorari<br><br>98TSPR70 |
| --- | --- |

Número del Caso: CC-97-0179

Abogados Parte Peticionaria: LCDO. LORENZO G. LLERANDI BEAUCHAMP
LCDO. JUAN E. TABOAS SANTIAGO

Abogados Parte Recurrida: LCDO. CARLOS LUGO FIOL, PROCURADOR GENERAL
LCDA. SYLVIA CANCIO BIGAS, PROCURADORA GENERAL AUXILIAR

Tribunal de Instancia: Superior, Sala de Mayaguez

Juez del Tribunal de Primera Instancia: Hon. Juan Camacho Fabre

Tribunal de Circuito de Apelaciones: Circuito Regional IV

Juez Ponente: Hon. Rossy García

Fecha: 6/12/1998

Materia: Daños y Perjuicios

        Este documento constituye un documento oficial del Tribunal
        Supremo que está sujeto a los cambios y correciones del
        proceso de compilación y publicación oficial de las
        decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

RUPERTO LOPEZ HERNANDEZ Y OTROS

    Demandantes-Peticionarios

        vs.                   CC-97-179       CERTIORARI

CENTRO DE MAYAGUEZ, DEPTO. DE
SALUD Y OTROS

    Demandados-Recurridos

Opinión del Tribunal emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI.

San Juan, Puerto Rico, a 12 de junio de 998.

Tenemos la ocasión para interpretar el Artículo 3.4 de la Ley de Etica Gubernamental, según enmendado, 3 L.P.R.A. sec. 1824, y así pautar su alcance preciso.

I

El 21 de mayo de 1990, los peticionarios presentaron una demanda de daños y perjuicios contra el Estado Libre Asociado de Puerto Rico, varios médicos, su compañía de seguros y otros demandados. Alegaron que como consecuencia de la negligencia médica de éstos o de sus agentes o empleados, ocurrida en el Centro Médico de Mayagüez, ocasionaron la muerte de Emma Núñez Vega, madre de una de los demandantes y esposa de otro. La difunta había estado bajo

tratamiento en el centro médico gubernamental por razón de su estado de gravidez. Falleció cuando tenía 32 semanas de embarazo, luego que comenzara a sangrar por el orificio de una amniocentesis que le practicaron en dicho centro médico.

Luego de numerosos trámites procesales, el 23 de junio de 1994, se celebró una conferencia sobre el estado de los procedimientos, ante el foro de instancia. La representación legal de los demandantes le informó al tribunal de instancia que aunque contaba con un perito patólogo, luego de innumerables gestiones, no habían logrado aún contratar un ginecólogo que actuase como perito en su caso. Explicó el abogado de los demandantes que ninguno de los ginecólogos consultados había accedido a servir de perito, por lo que se proponía remitir sendas cartas a treinta y dos (32) ginecólogos a través de toda la isla, en un último esfuerzo por conseguir el perito que interesaban. En vista de lo anterior, el tribunal de instancia le concedió un término de sesenta (60) días para llevar a cabo la gestión aludida.

El 15 de julio de 1994, la parte demandante celebró un contrato con el ginecólogo Dr. Héctor Cintrón Príncipe, quien además de ejercer en su oficina privada, laboraba como Médico V, a jornada completa, en el Departamento de Obstetricia y Ginecología del Hospital Regional de Bayamón. El doctor Cintrón comenzó de inmediato a prestar servicios como perito de la parte demandante. Para el 18 de septiembre de 1994 ya se le habían pagado al doctor Cintrón $3,000.00, por sus labores en el análisis del expediente médico del caso y sus reuniones con el

abogado de la parte demandante para discutir lo pertinente al análisis aludido.

Así las cosas, año y medio más tarde, el 14 de febrero de 1996, el Estado presentó ante el foro de instancia una "Moción Sobre Impugnación de Perito Médico", mediante la cual argumentó que el Artículo 3.4 de la Ley de Ética Gubernamental, según enmendada por la Ley 150 del 22 de diciembre de 1994, 3 L.P.R.A. sec. 1824, prohibía que el referido doctor Cintrón pudiese servir como perito médico de los demandantes en el presente caso, debido a que éste era empleado del Estado.

Por su parte, el 1ro. de marzo de 1996, la peticionaria presentó su oposición a la moción de impugnación. Adujo que la disposición aplicable al caso de autos era el Artículo 3.4(d) de la citada Ley 150, **la cual fue aprobada** el 22 de diciembre de 1994, **varios meses después de haber ellos suscrito el contrato sobre peritaje médico con el doctor Cintrón**. Alegó que no podía aplicarse la enmienda aludida retroactivamente; y que la aplicación de dicha disposición a los hechos de este caso violaba la norma constitucional que prohíbe el menoscabo de las obligaciones contractuales, establecida por el Artículo 7 de la Constitución del Estado Libre Asociado de Puerto Rico.

Trabada así la controversia, el 26 de agosto de 1996, el tribunal de instancia dictó una resolución mediante la cual declaró con lugar la solicitud de impugnación presentada por el Estado y dispuso que el doctor Cintrón no podía participar como perito de la parte demandante en este caso.

Ante dicha determinación, el peticionario interpuso un recurso de certiorari en el Tribunal de Circuito de Apelaciones,

reproduciendo los mismos planteamientos que había presentado ante el tribunal de instancia. Mediante sentencia de 26 de febrero de 1997, el foro apelativo confirmó la determinación del foro a quo.

Inconforme con el dictamen aludido, el 11 de abril de 1997, el peticionario acudió ante nos, e hizo el siguiente señalamiento de error:

> Erró el Honorable Tribunal del [sic] Circuito de Apelaciones al confirmar la Resolución del Tribunal de Instancia en la aplicación retroactiva de la Ley 150, supra, la cual enmendaba el Art. 3.4 de la Ley de Etica Gubernamental y determinar que no viola derechos constitucionales al amparo del Art. 11, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico.

El 2 de mayo de 1997, expedimos el certiorari solicitado. El 9 de julio de 1997 el peticionario presentó su alegato; el 24 de octubre de 1997 el Procurador General de Puerto Rico presentó el suyo. Con el beneficio de ambas comparecencias, pasamos a resolver.

II

Al momento en que el caso de autos se presentó ante nos, este Tribunal no había resuelto aún una controversia análoga a la que ahora nos concierne, que estaba pendiente. En efecto, el 19 de agosto de 1997, emitimos nuestra decisión en García v. Hosp. Reg. de Guayama, sentencia de 19 de agosto de 1997, 143 D.P.R. ___, 97 JTS 118, y resolvimos, mediante sentencia, que en aquel caso la Ley de Etica Gubernamental no tenía el alcance que el Estado pretendía darle. En aquella ocasión, aunque la mayoría de este Tribunal concurrió en el resultado anunciado en

la sentencia que emitimos, no formulamos una opinión del Tribunal porque no prevaleció entre nosotros un juicio mayoritario respecto a todos los fundamentos de nuestra decisión. En el caso de autos, sin embargo, una mayoría de este Foro comparte unos mismos criterios normativos, que fueron expresados o intimados por separado en las tres opiniones de conformidad emitidas en el caso de García v. Hospital Regional de Guayama, supra.

La controversia en García v. Hosp. Reg. de Guayama, giraba en torno a la participación como peritos de médicos empleados por el Recinto de Ciencias Médicas de la Universidad de Puerto Rico. La de autos trata sobre la participación en calidad de perito de un médico empleado por el Hospital Regional de Bayamón. No obstante, tampoco puede aplicarse aquí la Ley de Etica Gubernamental. Veamos porqué es ello así.

No hay duda alguna de que para las fechas cuando el contrato de peritaje en cuestión se celebró, y cuando se ejecutó por primera vez, la Ley de Etica Gubernamental vigente no impedía de modo alguno que el doctor Cintrón sirviese de perito de la parte demandante en este caso. La disposición pertinente de dicha Ley, su Artículo 3.4, sólo prohibía que un empleado gubernamental representara o asesorara a una persona privada **ante las agencias ejecutivas**. Nada disponía sobre tales servicios en procesos judiciales.

Claro está, al momento cuando el Estado solicitó la descalificación del doctor Cintrón como perito médico de los peticionarios, la disposición aludida había sido enmendada para incluir a los tribunales de justicia dentro del ámbito de su

prohibición. Véase, el Artículo 3.4(d) vigente, 3 L.P.R.A. sec. 1824(d). Dicha enmienda, sin embargo, no requiere necesariamente que se altere la situación del doctor Cintrón como perito en el caso de autos. Nótese, que aun la nueva disposición vigente en cuestión está sujeta a varias condiciones para que entre en vigor la prohibición que establece. Una de esas condiciones es que el empleado gubernamental **haya participado antes en el asunto en cuestión de manera personal y sustancial**, 3 L.P.R.A. 1824(e). Otra de las condiciones es que el servicio referido se preste durante **las horas laborables** del empleo gubernamental. Si tales condiciones no están presentes, el peritaje no está prohibido, **aun asumiendo que el asunto en cuestión aquí se rija bajo la ley vigente**, cosa que no es necesario resolver ahora en esta opinión.

En el caso de autos, no se ha probado, ni siquiera se ha alegado, que el doctor Cintrón había participado previamente de manera personal y sustancial en el asunto sobre el cual se requiere su opinión pericial. No se ha cumplido con esta condición esencial para que se le aplique la prohibición en cuestión de la Ley de Etica Gubernamental. Tampoco se ha establecido o alegado que el servicio a prestarse se realizará necesariamente durante horas laborables de su cargo médico en el Hospital Regional de Bayamón. Vista la evidente dificultad que ha tenido la parte demandante en procurar los servicios de un perito ginecólogo, si el doctor Cintrón no había participado de manera personal y sustancial en el asunto concreto del pleito

antes de presentarse la demanda[1], el foro de instancia ciertamente tiene la flexibilidad necesaria para fijar, por excepción, la vista con este perito de modo que no conflija con su horario oficial. De este modo, se atiende la necesidad de la parte demandante de poder contar con prueba pericial en apoyo de su reclamación, sin violar la prohibición de actuar como perito de personas privadas **durante horas laborables**.

Al reiterar normativamente aquí algunos de los fundamentos que expresamos por separado en nuestra decisión en García v. Hosp. Reg. de Guayama, supra, debemos enfatizar que, como se sabe, los demandantes en casos de impericia médica, especialmente en casos relacionados con la obstetricia y la ginecología, frecuentemente encaran serias dificultades en conseguir peritos médicos adecuados, que les permitan presentar sus reclamaciones judiciales. Interpretar la Ley de Etica Gubernamental, del modo tan estricto que nos propone el Procurador General, agravaría el problema aludido, y podría conducir a que, en efecto, se le cierren las puertas de los tribunales a algunos que tienen derecho a que sus reclamaciones se diluciden judicialmente. Reiteradamente hemos resuelto que existe un vital interés público en que las controversias judiciales se adjudiquen conforme a la verdad de los hechos. Mercado v. Panthers Military Soc. Inc., 125 D.P.R. 98 (1990); Echevarría Jiménez v. Sucn. Pérez Meri, 123 D.P.R. 664 (1989);

---

[1] La prohibición de que un funcionario público no intervenga judicialmente, en algún caso o asunto respecto al cual éste había tenido antes del pleito una participación personal y sustancial, es efectiva independientemente de que dicha intervención se haga durante horas laborables o no. Se

Berríos v. U.P.R., 116 D.P.R. 88 (1985); Pueblo v. Ríos Nogueras, 111 D.P.R. 647 (1981); J.R.T. v. Aut. De Comunicaciones, 110 D.P.R. 879 (1981). Este vital interés público no puede lograrse si una parte no logra conseguir un perito para apoyar su reclamación, privando también de ese modo al foro judicial de la información especializada que tal perito puede proveer. No puede este Foro acceder a tal interpretación, que no sirve los mejores fines de la justicia. No puede ser que dicha Ley haya sido aprobada para privar a los tribunales de medios vitales para realizar su ingente función.

Por las razones expuestas, se dictará sentencia para revocar las del foro apelativo y del de instancia, que ordenaron la descalificación como perito médico del doctor Cintrón en el caso de autos. Se devolverá éste al tribunal de instancia, para que continúen los procedimientos conforme a lo aquí resuelto. También se dispondrá que el Reglamento de Etica Gubernamental queda atemperado en lo pertinente por lo aquí resuelto.

En vista de los fundamentos de esta decisión, se hace innecesario resolver la cuestión constitucional que se nos había planteado. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958).

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

---

trata de una prohibición que atañe en cualquier momento, por el obvio **conflicto de interés** que apareja.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


RUPERTO LOPEZ HERNANDEZ Y OTROS

    Demandantes-Peticionarios


        vs.                CC-97-179        CERTIORARI

CENTRO DE MAYAGUEZ, DEPTO. DE
SALUD Y OTROS

    Demandados-Recurridos


SENTENCIA


San Juan, Puerto Rico, a 12 de junio de 1998.


Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente, se dicta sentencia para revocar las del Tribunal de Circuito de Apelaciones, Región IV de Mayagüez-Aguadilla, y del Tribunal Primera Instancia, Sala Superior de Mayagüez, que ordenaron la descalificación como perito médico del doctor Cintrón en el caso de autos.

Se devuelve éste al Tribunal de Primera Instancia, Sala Superior de Mayagüez, para que continúen los procedimientos conforme a lo aquí resuelto. También se dispone que el Reglamento de Etica Gubernamental queda atemperado en lo pertinente por lo aquí resuelto.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rebollo López disiente sin opinión. El Juez Asociado señor Corrada del Río disiente con opinión.


                          Isabel Llompart Zeno
                  Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Ruperto López Hernández
y Otros

    Demandantes-Peticionarios

       v.                          CC-97-179        Certiorari

Centro de Mayagüez, Depto. de
Salud y Otros

    Demandados-Recurridos


Opinión Disidente emitida por el Juez Asociado SEÑOR CORRADA DEL RÍO

San Juan, Puerto Rico, a 12 de junio de 1998.

I

A través del recurso de epígrafe, se nos ha planteado la controversia de si el hecho de que un médico que se desempeña como Médico V en el Departamento de Obstetricia y Ginecología del Hospital Regional de Bayamón actúe como perito de la parte demandante en una reclamación judicial de daños y perjuicios por alegada impericia médica instada contra el Estado, o el Centro Médico de Mayagüez, constituye una de las actividades proscritas a los servidores públicos por las disposiciones de la Ley de Etica Gubernamental del Estado Libre Asociado de Puerto Rico[2] y el Reglamento de Etica Gubernamental aprobado en virtud de dicha Ley.[3]

En ánimo de salvaguardar los valores que subyacen en el espíritu y propósitos de la referida Ley y su correspondiente Reglamento, resolveríamos que la participación de dichos servidores públicos como

---

[2]Ley 12 de 24 de julio de 1985, 3 L.P.R.A. sec. 1801 et seq.

[3]3 R.P.R. sec. 44.1 et seq. (1996).

peritos de la parte demandante representaría una violación a los citados estatutos.  En su consecuencia, confirmaríamos la sentencia recurrida y decretaríamos la descalificación del referido facultativo médico como testigo pericial.  Por no ser ese el resultado de la Opinión emitida hoy por este Tribunal, disentimos.

## II

El recurso instado en el caso de epígrafe interesa la revisión y revocación de una sentencia emitida el 26 de febrero de 1997[4] por el Tribunal de Circuito de Apelaciones mediante la cual dicho foro confirmó una Resolución emitida por el Tribunal de Primera Instancia, Sala Superior de Mayagüez, el 26 de agosto de 1996.[5]  La Resolución confirmada por el Tribunal de Circuito de Apelaciones declaró ha lugar una moción sobre impugnación de perito médico promovida por el codemandado, Estado Libre Asociado de Puerto Rico (E.L.A.), y predicada en el artículo 3.4 de la Ley de Etica Gubernamental, supra, según enmendada por la Ley Núm. 150 de 22 de diciembre de 1994, 3 L.P.R.A. sec. 1824.  Prohibió así la participación del Dr. Héctor L. Cintrón Príncipe, a quien

---

[4]Notificada el 12 de marzo de 1997.

[5]Notificada el 29 de agosto de 1996.

los demandantes pretendían utilizar como perito médico en el caso por ellos instado contra el Estado y otros demandados.  Al así dictaminar, el foro recurrido desmereció la contención de los aquí recurrentes, quienes postularon en oposición que, habiéndose aprobado la enmienda introducida por la Ley Núm. 150 de 1994, <u>supra</u>, con posterioridad a haberse concertado el contrato sobre peritaje médico[6], la aplicación del Art. 3.4 (d) de la Ley de Etica Gubernamental, <u>supra</u>, a los hechos del caso violentaba lo dispuesto en el Art. II, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico.[7]

Inconformes, los recurrentes acuden ante nos imputando la comisión del siguiente error:

> "Erró el Honorable Tribunal del [sic] Circuito de Apelaciones al confirmar la Resolución del Tribunal de Instancia en la aplicación retroactiva de la Ley 150, supra, la cual enmendaba el Art. 3.4 de la Ley de Etica Gubernamental y determinar que no viola derechos constitu-cionales al amparo del Art. 11, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico."

III

Con el propósito de promover y preservar la integridad de los funcionarios e instituciones del Estado y a los fines de restaurar la confianza del pueblo en su gobierno y sus servidores públicos, el 24 de julio de 1985 la

---

[6]El cual fue celebrado el 15 de julio de 1994.

[7]1 L.P.R.A. Art. II sec. 7.

Legislatura aprobó la Ley de Etica Gubernamental del Estado Libre

Asociado de Puerto Rico, supra.

La Exposición de Motivos de dicha Ley, Leyes de Puerto Rico, 1985,

págs. 708 y 709, dispone:

> "Nuestro pueblo creció históricamente con una ejemplar tradición cultural y una moralidad de corrección y de excelencia. Como pueblo, como personas y, aún más, como funcionarios públicos, no podemos alejarnos de esa orientación.
>
> El Estado Libre Asociado de Puerto Rico, como cuerpo político, está comprometido con una responsabilidad moral y con una responsabilidad ética en el sentido de obrar de acuerdo a unas normas y principios que rigen la conducta del buen vivir de su gente. Esa responsabilidad ética obliga a un continuo examen del comportamiento social y público de sus ciudadanos.
>
> En todo momento, tiene el Estado que garantizar el respeto al derecho y la obediencia a la ley. Esta misión le es fundamental especialmente cuando se trata de la conducta de aquellos funcionarios públicos que lo representan como servidores.
>
> Hay ocasiones en que, por desventura, surgen unas acciones improcedentes por parte de algunos funcionarios que, al incurrir en claras faltas a las normas de ética, ponen en riesgo la estabilidad del soporte moral del Estado. Es intolerable que existan funcionarios públicos en representación de la administración del Gobierno que puedan lucrarse del patrimonio del pueblo. Los conflictos de intereses, especialmente financieros, en abierta violación a las leyes, son también intolerables.
>
> Para restaurar la confianza del pueblo en su Gobierno y en sus funcionarios públicos, cuando muchos de ellos han rebasado el nivel de lo tolerable, es preciso adoptar nuevas medidas legislativas que sean eficaces para prevenir y para penalizar el comportamiento delictivo de aquellos funcionarios que, en el desempeño de sus labores gubernamentales, vulneren los principios básicos de una ética de excelencia.
>
> En vista de estas consideraciones, entendemos que la aprobación de un Código de Etica para los funcionarios y empleados de la Rama Ejecutiva y la creación en esta Ley de la Oficina de Etica Gubernamental es una medida cuya aprobación es de trascendental importancia."

Como parte del andamiaje gubernamental para adelantar directamente

tan importantes y laudables intereses públicos, la Ley Núm. 12, supra,

estableció, entre otros, un Código de Etica dirigido a reglamentar la

conducta de los funcionarios y empleados de la Rama Ejecutiva del Estado

Libre Asociado, incluyendo sus corporaciones públicas y las agencias

que estén bajo el control de dicha Rama, sus municipios, corporaciones y consorcios municipales. 3 L.P.R.A. sec. 1821.

Se creó, además, la Oficina de Etica Gubernamental, la cual tiene a su cargo la responsabilidad de velar, incentivar y promover que se cumplan estrictamente las disposiciones aprobadas. 3 L.P.R.A. sec. 1811. Esta Oficina es dirigida por un Director Ejecutivo[8], quien al amparo del artículo 2.4 de la Ley, 3 L.P.R.A. sec. 1814, tiene las siguientes facultades y deberes indispensables para llevar a cabo la encomienda de dicha entidad gubernamental:

"[...]

(a) Promover y formular políticas y programas de conducta ética y moral para los servidores públicos dirigidos a la consecución de los siguientes objetivos:

(1) El establecimiento de criterios de excelencia, integridad personal, honestidad, responsabilidad y veracidad, en las gestiones públicas para inspirar, fomentar y restituir la confianza de los ciudadanos en las instituciones gubernamentales.

(2) El compromiso por parte de todos los servidores públicos de que sus intereses personales no sustituirán los intereses públicos [...]

(b) Interpretar, aplicar y hacer cumplir las disposiciones de este capítulo y las reglas y reglamentos que establecen determinadas prohibiciones respecto a la conducta de ciertos funcionarios y empleados públicos o que rigen las cuestiones de ética, de conflicto de intereses y de radicación de informes financieros. [...]

(h) Promulgar los reglamentos que sean necesarios y convenientes para cumplir con los propósitos de esta medida, [...]." (Enfasis suplido)

De la disposición antes transcrita se puede colegir claramente que la Asamblea Legislativa delegó a la Oficina de Etica Gubernamental, a través de su Director, amplias facultades para la formulación dinámica de

---

[8]3 L.P.R.A. sec. 1812.

reglas que aseguren la consecución de los fines que persigue la legislación en controversia. Delegación que resulta adecuada, en vista de que la propia Ley, aunque no establece normas detalladas y minuciosas, dispone pautas suficientes que sirven de guía, dirigiendo y limitando el uso del poder conferido.[9]

Fue precisamente dentro del ámbito de tales poderes y facultades, que el 23 de noviembre de 1992 quedó promulgado el Reglamento de Etica Gubernamental, supra. Reglamento cuyo propósito se describe expresamente en su artículo 2 de la siguiente manera:

> **"Es esencial que los funcionarios y empleados del servicio público mantengan principios del más alto grado de honestidad, integridad, imparcialidad y conducta para garantizar el debido funcionamiento de las instituciones gubernamentales y conservar la confianza de los ciudadanos en su gobierno.** Evitar una conducta impropia y conflictos de intereses por parte de los servidores públicos es indispensable para mantener estos principios. Por consiguiente, este Reglamento tiene el **propósito de establecer normas de conducta ética** aplicables a todos los funcionarios y empleados de la Rama Ejecutiva del Gobierno del Estado Libre Asociado de Puerto Rico, incluyendo las corporaciones públicas, los municipios y las agencias bajo la jurisdicción de dicha Rama y establecer, además, ciertas normas para las actuaciones de los ex-servidores públicos de las tres ramas del Gobierno." (Enfasis suplido).

Ahora bien, cumpliendo con el propósito señalado, el cual indubitadamente resulta acorde con el principio cardinal de la Ley Núm. 12, supra, el artículo 13[10] del Reglamento de Etica Gubernamental proscribe expresamente ciertas "actividades incompatibles con el empleo" de los servidores públicos. En lo que respecta a los casos que nos ocupan, dicho artículo, en su inciso (c), coloca dentro de su prohibición directa las siguientes actividades:

> "(c) Ningún funcionario o empleado público aceptará otro empleo, ni se dedicará a cualquier actividad comercial, profesional o de otra naturaleza, en las siguientes circunstancias:
>
> 1) Cuando esté o **parezca** estar en conflicto sustancial con los intereses <u>de la agencia ejecutiva para la cual trabaja o con los intereses del Gobierno</u>.

---

[9]Cf., <u>López</u> v. <u>Junta</u>, 80 D.P.R. 646, 661 (1958).

[10]3 R.P.R. sec. 44.11 (1996).

2) Cuando interfiera o razonablemente se
pueda esperar que influya en el desempeño
de sus funciones oficiales.

3) Cuando le impida prestar una jornada
completa de trabajo a la agencia.

4) Cuando traiga descrédito a la agencia o al
Gobierno." (Enfasis suplido).

Como podrá observarse, con el precepto invocado se pretende evitar incluso la apariencia o sospecha de conducta impropia y situaciones conflictivas. Tal pretensión resulta lógica y completamente válida, si se desea fomentar y preservar la clara y contundente política pública del Estado de restablecer la confianza de nuestra ciudadanía en los funcionarios o empleados públicos, y el servicio gubernamental.

Sobre el particular, debemos señalar que aún la apariencia de conducta impropia o conflicto de intereses puede tener un efecto tan dañino sobre la imagen, confianza y respeto del público por su gobierno, como la verdadera impropiedad ética. Así lo confirman las siguientes expresiones:

> "`[T]here is a tendency to think of appearances as merely prudential, as a tool of public relations, rather than as having any ethical significance themselves.' [nota al calce omitida] This tendency may obscure the significance of appearances in the public realm. `[I]n the more impersonal world of politics, reality and appearance blend together so that we cannot often tell the difference.' [nota al calce omitida] That is, the public can judge the effectiveness of government only by reference to what it sees. It often has no way to look beyond the appearance to judge the reality. For this reason, the appearance of loyal, conflict-free government is important. [nota al calce omitida]" Beth Nolan, Public Interest, Private Income: Conflicts and Control Limits on the Outside Income of Goverment Officials, 87 Nw. U.L. Rev. 57, 77-78 (1992).

IV

Procede determinar si lo antes expuesto justifica la descalificación del perito anunciado por los demandantes-recurrentes en el caso ante nuestra consideración.

El Dr. Cintrón Príncipe, como servidor público, ocupa una posición que le hace merecedor de la confianza pública. Ello conlleva el cumplimiento de toda política pública gubernamental, y el desempeño de su

trabajo con la mayor lealtad y de manera tal que su conducta no se preste a malas interpretaciones que pudieran crear serias dudas en cuanto a la gestión pública.  No sólo deben ser éticas sus actuaciones, sino que también tienen la gran responsabilidad de lucir como tal ante nuestra sociedad.

De permitirse a este médico actuar como perito de la parte demandante, estaría asesorando a personas privadas con intereses litigiosos contrarios al Estado o sus dependencias.  Situación en la que, por un lado rinde servicios remunerados al Estado a través de una de sus instrumentalidades, y por otro, pretende fortalecer con su peritaje, cobrando honorarios para su beneficio personal, la reclamación en contra del propio Estado.  No podemos permitir tales circunstancias, ya que obviamente ello propiciaría, cuando menos, el que se proyecte ante el pueblo la imagen de una situación conflictiva, menoscabando el apremiante propósito legislativo de la Ley de Etica Gubernamental.  Es inconcebible que la mayoría de este Tribunal no lo entienda así.

V

Debemos precisar el alcance del Artículo 3.4 (c) de la Ley de Etica Gubernamental, _supra_, a los fines de determinar si el mismo incluye dentro de su prohibición la impugnada ejecutoria del Dr. Cintrón Príncipe como perito en el presente caso.

Con la aprobación de la Ley Núm. 12, _supra_, en lo pertinente, la Legislatura dispuso dentro de las prohibiciones éticas dirigidas a los servidores públicos, ciertas actividades relacionadas con la representación de intereses privados conflictivos con sus funciones oficiales.  A tales efectos, el artículo 3.4 (c) dispuso expresamente que "[n]ingún funcionario o empleado público [podría] representar o de cualquier otra manera asesorar, directa o indirectamente, a persona privada alguna ante cualquier _agencia ejecutiva_ a cambio de compensación o beneficio económico, en _casos o asuntos_ relacionados con el Gobierno de Puerto Rico ni en casos o asuntos que envuelvan conflictos de intereses o

de política pública entre el Gobierno y los intereses de dicha persona privada."

Como podrá notarse, originalmente el texto del artículo aludido contemplaba dentro de su prohibición únicamente el asesoramiento o representación de personas privadas por parte de los servidores públicos ante agencias ejecutivas, mas no así el asesoramiento o representación ante los tribunales de justicia.   No obstante, con la aprobación de las enmiendas contenidas en la Ley Núm. 150, supra, legislación que tuvo el propósito de ampliar el alcance de las prohibiciones contenidas en el Código de Etica, el Legislador hizo extensiva tal prohibición  a casos ante los tribunales.  De esta manera se concretó la intención legislativa de promover aún más la integridad de los funcionarios y empleados públicos.

Específicamente, con la aprobación de dicha enmienda el artículo 3.4 (c), supra, dispone de la siguiente manera:

"(c)    Ningún funcionario o empleado público podrá representar o de cualquier otra manera asesorar, directa o indirectamente, a persona privada alguna ante cualquier agencia ejecutiva, tribunal u otra dependencia gubernamental, en casos y asuntos relacionados con el Gobierno de Puerto Rico, ni en casos y asuntos que envuelvan conflictos de intereses o política pública entre el Gobierno y los intereses de dicha persona privada."

Señala la mayoría que la disposición vigente está sujeta a varias condiciones para que entre en vigor la prohibición que establece. Confunde el significado de las palabras casos y asuntos como si sus significados fueran idénticos.   Al así hacerlo, concluye que la prohibición del Art. 3.4 (c) sólo entra en vigor cuando el empleado gubernamental haya participado anteriormente en el asunto en cuestión de manera personal y sustancial, requisito que sólo rige a la palabra asuntos.

Con la aprobación de la referida enmienda al Art. 3.4(c) se clarificó el alcance de los conceptos "casos" y "asuntos", sustituyendo la  conjunción "o" que seguía a la palabra "casos" por la conjunción "y".

Ahora bien, el inciso (e) del artículo 3.4, supra, define expresamente el concepto "asunto" disponiendo:

> "(e)  Para los fines de esta sección y de la sec. 1828 de este título el término `asunto' significa aquellos en que el funcionario o empleado haya participado personal y sustancialmente y que ocurrieron mediante decisión, aprobación o desaprobación, recomendación o consejo, o investigación particular que involucre partes específicas. No incluye la intervención o participación del funcionario o empleado en la promulgación de normas o reglamentos de aplicación general o de directrices e instrucciones abstractas que no aludan a situaciones particulares o casos específicos."   (Enfasis suplido)

Al amparo de tal definición pretende sostener su decisión la mayoría. A esos efectos concluye que la palabra "casos" está comprendida dentro del significado del término "asunto". Planteamiento que la lleva a concluir que no habiendo participado personalmente en los hechos del caso, y en vista de que dentro de las funciones del Dr. Cintrón Príncipe no se encuentra la intervención en la promulgación de la política pública establecida por el Departamento de Salud o sus instituciones, no le son de aplicación las disposiciones contenidas en el aludido artículo 3.4 (c). El procurar la protección de los intereses públicos tras la Ley de Etica Gubernamental nos impide avalar tal interpretación.

Sobre el particular, la Comisión de Etica Gubernamental, al analizar las enmiendas contenidas en la Ley Núm. 150, supra, sostuvo lo siguiente en su Informe de 23 de junio de 1993 presentado al Senado:

> "También se enmienda el Inciso (c) para sustituir la "o" que le sigue la palabra casos por una "y". Actualmente [lógicamente al momento de rendir el Informe; es decir, antes de la aprobación de la enmienda] se puede interpretar que las palabras casos y asuntos tienen el mismo significado. La palabra asuntos está definida en el propio Artículo 3.4 y comprende aquellos en que el funcionario o empleado público haya participado personal y sustancialmente, pero excluyendo la intervención en la promulgación de normas o reglamentos de aplicación general [...]" (Enfasis suplido).

La lectura de las expresiones vertidas, a todas luces indica que la intención legislativa al aprobar la enmienda aludida fue dejar claramente establecido que los términos "casos" y "asuntos" no pueden considerarse

sinónimos. Se puede colegir claramente que la palabra "asunto" está definida en el propio Artículo 3.4, mas no así el término "casos". Interpretar lo contrario tornaría la enmienda aprobada en una actuación completamente fútil, yendo así en contra de la clara intención legislativa. Más aún, le asiste la razón a la parte recurrida al sostener que si la postura de los recurridos fuese la correcta, hubiese resultado sencillo al legislador el disponer ambos conceptos dentro de la definición contenida en el inciso (e) del artículo 3.4, supra.

A la luz de lo antes expuesto, resulta ineludible concluir, y así lo interpretamos, que lo que gramaticalmente quiso decir la Legislatura al disponer "casos y asuntos" fue incluir dentro de la prohibición del artículo 3.4 (c), supra, tanto el concepto "asunto" según definido por la propia Ley, como el concepto "casos" en su acepción general de aquellas controversias relacionadas con el Gobierno o que envuelvan conflictos de intereses o política pública entre el Gobierno y los intereses de dicha persona privada, sometidas ante un tribunal, agencia ejecutiva, u otra dependencia gubernamental, independientemente de que el servidor público haya estado previamente involucrado o no con la controversia.

Tal interpretación es la única que logra un resultado que representa plenamente el propósito tras la aprobación de la Ley de Etica Gubernamental. Como señaláramos antes, en casos como los de autos estos servidores públicos estarían asesorando a personas privadas con intereses litigiosos contrarios al Estado o sus dependencias. Lo cual, a fin de cuentas, presentaría un conflicto de intereses o política pública entre el Gobierno y los intereses de dicha persona privada, independientemente de que el servidor público haya tenido contacto previo con los hechos del caso.

Visto que las palabras "casos" y "asuntos" tienen significados distintos, es improcedente concluir, como lo hace la mayoría, que el significado de la palabra casos se encuentra limitado por la definición provista en la Ley de la palabra "asuntos". Por tanto, la prohibición

contenida en el Art. 3.4 (c) no se encuentra sujeta a la condición de que el empleado gubernamental haya participado anteriormente en el asunto sobre el cual habría de testificar en contra del Estado.

Igualmente errónea es la Opinión Mayoritaria al concluir que la prohibición se extiende únicamente a horas laborables. Aplica al caso de autos los requisitos que el legislador estableció para la aplicación del Artículo 3.4 (d) de la Ley de Etica Gubernamental, 3 L.P.R.A. 1824 (d). Dicho Artículo dispone que:

> "(d)   Ningún funcionario o empleado público a jornada completa podrá, durante horas laborables, representar, asesorar o servir como perito a personas o entidades privadas en litigios, vistas, audiencias públicas o cualquier asunto ante tribunales de justicia, organismos cuasi judiciales y agencias adminis-trativas."[11]

Según se desprende de la citada disposición, es evidente que la prohibición en ella contenida es de aplicación en casos en que algún funcionario o empleado
público a jornada completa desea representar, asesorar o servir como perito a personas privadas en casos y asuntos que no sean en contra de su patrono, el E.L.A.

Un examen del historial legislativo de esta medida revela que la única intención del legislador al aprobarla fue erradicar la práctica que tenían algunos servidores públicos de utilizar las horas laborables para desempeñarse como peritos o asesorar o representar a personas privadas ante los foros administrativos y judiciales cargándolas a su licencia de vacaciones.

En síntesis, sostenemos, contrario a la mayoría, que el referido artículo 3.4 (c) debe ser interpretado a los fines de disponer que ningún funcionario o empleado público podrá representar o de cualquier otra manera asesorar, directa o indirectamente, a persona privada alguna ante

---

[11]Obsérvese que el legislador aquí nuevamente distingue entre "casos" y "asuntos". Así, al mismo tiempo que hace claro que la prohibición de servir como perito es absoluta y terminante, reitera que la misma se extiende a "casos", "litigios, vistas o audiencias públicas", y a "asuntos", presentados ante los foros administrativos, cuasi judiciales y judiciales.

cualquier agencia ejecutiva, tribunal u otra dependencia gubernamental: **(a)** en aquellos **"asuntos"** particulares, según definidos por el propio artículo 3.4 (e), relacionados con el Gobierno de Puerto Rico o que envuelvan conflictos de intereses o política pública entre el Gobierno y los intereses de dicha persona privada; ni **(b)** en aquellos **"casos"**, en su acepción general, relacionados con el Gobierno de Puerto Rico o que envuelvan conflictos de intereses o política pública entre el Gobierno y los intereses de dicha persona privada, independientemente de que el servidor público haya estado involucrado previamente con la controversia envuelta en el caso.

VI

La recurrente argumenta que el decretar la descalificación de su testigo pericial al amparo del artículo en controversia, tendría el efecto de violar la garantía constitucional contra el menoscabo de las obligaciones contractuales. Art. II, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico[12]. La falla de dicho argumento consiste en que el mismo no toma en consideración que en el caso de autos las relaciones contractuales entre las partes comenzaron con posterioridad a la vigencia del Reglamento de Etica Gubernamental, el cual según sostuvimos antes, en su artículo 13 (c) (1) proscribe los servicios que éstos pretenden prestar.

De otra parte, hemos resuelto que "[...] por razones superiores de orden público, [la protección contra el menoscabo de las obligaciones contractuales] puede quedar subordinada al poder de reglamentación. [...] Al considerar la validez de estatutos bajo la cláusula de menoscabo el criterio aplicable es el de razonabilidad [...], y la razonabilidad del estatuto se determina tomando en consideración principalmente la sustancialidad del interés público promovido por el mismo y la dimensión del menoscabo ocasionado por su aplicación

---

[12]Dicha Sección dispone:

"No se aprobarán leyes que menoscaben las obligaciones contractuales."

retroactiva.  [citas omitidas]  Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 395-396 (1973).[13]

Aduce la recurrente que la reglamentación aludida no cumple con el escrutinio de racionalidad.  No le asiste la razón.  La reglamentación en controversia en el caso de autos resulta claramente válida bajo el referido escrutinio de racionalidad.  Como hemos señalado, tal reglamentación, aprobada dentro de los amplios poderes delegados, pretende evitar la existencia o apariencia de conflicto con los intereses de la dependencia gubernamental para la cual labora el servidor público, o con los intereses del gobierno.

Ello, a su vez y por las razones esbozadas anteriormente, tiene el efecto de salvaguardar y fomentar el propósito completamente legítimo y razonable de promover y preservar la integridad de los servidores e instituciones del Estado, y la confianza del pueblo en su gobierno.  En consecuencia, existe un nexo racional entre la reglamentación aludida y los propósitos que se pretenden lograr.  Véanse, San Miguel Lorenzana v. E.L.A., 134 D.P.R. ____ (1993), Op. de 1ro de noviembre de 1993, 93 J.T.S. 135; M & B.S., Inc. v. Dept. de Agricultura, 118 D.P.R. 319 (1987); Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984); Marina Ind., Inc. v. Brown Boveri Corp., 114 D.P.R. 64 (1983); Cleburne v. Cleburne Living Center, 473 U.S. 432, 87 L. Ed. 2d 313 (1985); Schweiker v. Wilson, 450 U.S. 221, 67 L. Ed. 2d 186 (1981); Minnesota v. Clover Leaf Creamy Co., 449 U.S. 456, 66 L. Ed. 2d 659 (1981); San Antonio School District v. Rodríguez, 411 U.S. 1, 36 L. Ed. 2d 16 (1973); y Dandridge v. Williams, 397 U.S. 471, 25 L. Ed. 2d 491 (1970).

VII

Por todos los fundamentos expuestos anteriormente, ordenaríamos la descalificación del perito anunciado por la parte demandante en el caso de epígrafe, evitando de esta manera que su participación como tal pueda provocar, o parecer que provoca, un conflicto con los intereses del

---

[13]Véase además, Bayrón Toro v. Serra, 119 D.P.R. 605 (1987) y casos allí citados.

Estado o de la dependencia gubernamental en la cual se desempeña como servidor público. Al así concluir, evitaríamos que incurra en violación a las disposiciones del artículo 13 (c) (1) del Reglamento de Etica Gubernamental o a las disposiciones del artículo 3.4 (c) de la Ley de Etica Gubernamental, supra.

Por consiguiente, confirmaríamos la resolución recurrida y ordenaríamos la descalificación del doctor Héctor Cintrón Príncipe como perito de la parte demandante-recurrente. Por no hacerlo así este Tribunal, ello en perjuicio de los mejores intereses públicos, disentimos.


BALTASAR CORRADA DEL RIO
Juez Asociado